**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Friedkin Group Incorporated,<br><br>        Plaintiff,<br><br>v.<br><br>danfriedkin.com,<br><br>        Defendant. | No. CV-17-00949-PHX-BSB<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Friedkin Group, Inc., (Plaintiff or Friedkin) has filed a Motion for Default Judgment, pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure. (Doc. 13.) Plaintiff asks the Court to enter judgment in its favor and transfer the Defendant domain name *danfriedkin.com* to Friedkin. (*Id.*) As set forth below, the Court recommends the entry of default judgment in Plaintiff's favor and an order transferring the domain name *danfriedkin.com* to Friedkin.[1]

**I.     Procedural Background**

On March 30, 2017, Plaintiff filed a Complaint asserting *in rem* jurisdiction against the domain name *danfriedkin.com*, the *res*, and alleging violations of the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d). (Doc. 1.) Specifically, Plaintiff alleges that it owns an unregistered trademark, FRIEDKIN, that it

---

[1] Plaintiff has consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). However, because Defendant has not appeared or consented to magistrate judge jurisdiction, the Court proceeds by a Report and Recommendation. *See* General Order 11-03.

has common law trademark rights for its mark, and that its mark is protection under the Lanham Act, 15 U.S.C. §§ 1051-1072, 1091-1096, 1111-1127, and 1141-1141n.[2] (*Id.* at ¶¶ 1, 12, 18.)  Plaintiff further alleges that Rajesh Kumar (registrant or Kumar), a resident of India, registered the Defendant domain name on October 30, 2016 through the domain registrar GoDaddy.com, LLC (GoDaddy).  (*Id*. at ¶¶ 8, 13, 14.)  Plaintiff alleges that the registrant, Kumar, violated the ACPA by his unauthorized use of the FRIEDKIN mark in his registration and use of the domain name *danfriedkin.com*.  (*Id*. at ¶¶ 17-22.)  Plaintiff alleges that the registrant acted with a bad faith intent to profit.  (*Id.* at ¶¶ 1, 15, 16.)

On April 4, 2017, Plaintiff moved for leave to publish notice of this action in *The Arizona Republic.*  (Doc. 6.)  Under the ACPA, service of process in an *in rem* action is made by "sending a notice of the alleged violation and intent to proceed under [§ 1125(d)] to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar," and "by publishing notice of the action as the court may direct promptly after filing the action."  15 U.S.C. § 1125(d)(2)(B).  Plaintiff sent notice by mail and e-mail, with a file-stamped copy of the Complaint, to the domain name registrant, and sought leave to complete service by publishing notice of this action.  (Doc. 6 at Ex. 1, ¶¶ 2, 4; Doc. 11, Ex. 1 at ¶ 4; Doc. 13 at 2.)  On April 5, 2017, the Court granted the motion and directed Plaintiff to publish notice of the action.  (Doc. 7.)

On May 17, 2017, Plaintiff moved for the entry of default asserting that, after proper service, Defendant failed to answer or respond to the Complaint.  (Doc. 11.)  The Clerk of Court entered default on May 19, 2017.  (Doc. 12.)  On June 6, 2017, Plaintiff filed the pending application for default judgment.  (Doc. 13.)  On July 28, 2017, Plaintiff

---

[2] Congress amended the Trademark Act of 1946 (the Lanham Act) in 1999 to add section 43(d), which is codified as the ACPA at 15 U.S.C. § 1125(d), and is intended to protect consumers and to prevent misappropriation of trademarks by stopping "cybersquatting."  *City of Carlsbad v. Shah,* 850 F. Supp. 2d 1087, 1103 (S.D. Cal. 2012) (citations omitted).  Cybersquatting is defined as the bad faith use of a domain name to profit from the goodwill of a protected mark belonging to someone else.  *Denso Corp. v. Domain Name denso.com,* 2014 WL 7208488, at *3 (N.D. Cal. Dec. 17, 2014).  Cybersquatting occurs when the registrant of an infringing domain name attempts to profit by ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder.  *Bosley Med. Inst., v. Kremer,* 403 F.3d 672, 680 (9th Cir. 2005) (citation omitted).

filed an emergency notice and declaration regarding modification of domain name, which the Court construed as a motion for expedited consideration of Plaintiff's motion for default judgment and denied. (Docs. 14, 15.) In this notice, Plaintiff stated that the registrant has modified the Defendant domain name, which previously had no content other than a GoDaddy "placeholder" page, by adding a solicitation to sell the domain name for $19,000. (Doc. 14, Ex. A at ¶ 2 and Ex. 2.)

## II. Jurisdiction, Venue, and Service of Process

### A. Subject Matter Jurisdiction and Venue

The Court must have both subject matter jurisdiction and personal or *in rem* jurisdiction over a defaulting defendant before it can enter a default judgment. *Enterprise Holdings, Inc. v. Enterprisecarrentals.com,* 2012 WL 527355, at *3 (E.D. Va. Jan. 30, 2012). Plaintiff asserts cybersquatting claims under the ACPA, 15 U.S.C. § 1125(d), and this Court has subject matter jurisdiction under 15 U.S.C. §§ 1121(a) and 1125(d), and 28 U.S.C. §§ 1331 and 1338(a). Plaintiff alleges that GoDaddy is the domain name registrar for the Defendant domain name and is located in this district. (Doc. 1 at ¶¶ 8, 13.) Therefore, venue is proper in this district. *See* 15 U.S.C. § 1125(d)(2)(A) ("[t]he owner of a mark may file an *in rem* civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located, . . .").

### B. *In Rem* Jurisdiction

In § 1125(d)(2)(A), the ACPA provides for an *in rem* action against a domain name if the owner of a mark establishes that its rights were violated, and that it either could not obtain personal jurisdiction over a person who would otherwise have been a defendant in a civil action under the ACPA, or through due diligence was not able to find a person who would have been the defendant in such an action. 15 U.S.C. § 1125(d)(2)(A). The statute provides that:

> (2)(A) The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other

>  domain name authority that registered or assigned the domain name is located if —
>
>  (i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c) of this section; and
>
>  (ii) the court finds that the owner —
>
>  (I) is not able to obtain in personam jurisdiction over a person who would have been a defendant in a civil action under paragraph (1); or
>
>  (II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) . . . .

*Id*.

Therefore, to establish *in rem* jurisdiction under the ACPA, Plaintiff must first allege that the domain name violates any right of the owner of a mark registered with the Patent and Trademark Office, or protected under 15 U.S.C. § 1125(a) or (c). *Id.* at § 1125(d)(2)(A)(i). Second, Plaintiff must show that it was unable to obtain personal jurisdiction over a person who would otherwise have been a defendant in a civil action under the ACPA, or through due diligence could not find the person who would have been a defendant in such an action. *Id.* at § 1125(d)(2)(A)(ii). Thus, to establish *in rem* jurisdiction, and entitlement to a remedy, Plaintiff must plead and prove a substantive violation of the Lanham Act and the inadequacy of personal jurisdiction. 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25A:74 (4th ed. 2017). The sufficiency of Plaintiff's substantive claim and inadequacy of personal jurisdiction are addressed below.

### 1. Plaintiff's Cybersquatting Claim

Plaintiff's Complaint alleges a claim for cybersquatting under the ACPA, 15 U.S.C. § 1125(d). (Doc. 1 at ¶¶ 17-22.) Plaintiff alleges that it is the owner of an unregistered trademark. (*Id.* at ¶ 12; Doc. 13 at 4.) Therefore, the Court must consider whether the owner of an unregistered trademark may bring a claim for cybersquatting under the *in rem* provisions of the ACPA. To determine the scope of the ACPA, the Court reviews the terms of the statute and the applicable case law.

### a.     Scope of the ACPA

In its two subsections, the ACPA provides an *in personam* claim, in § 1125(d)(1), against a person who registers an infringing domain name, and an *in rem* claim, in § 1125(d)(2), against the infringing domain name. The first subsection, which establishes an *in personam* action, also defines the substantive elements of a cybersquatting claim. *See* 15 U.S.C. § 1125(d)(1)(A). This section provides that:

> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section if, without regard to the goods or services of the parties, that person —
>
> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii) registers, traffics in, or uses a domain name that —
>
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; . . . .

*Id.*

Therefore, "the owner of a mark" may bring an *in personam* claim for cybersquatting against "a person," who has "a bad faith intent to profit from that mark" and "registers, traffics in, or uses a domain name" that "is identical or confusingly similar to" a "distinctive mark," or that "is identical or confusingly similar to or dilutive of" a "famous mark." *Id.* By its plain language, this section of the ACPA establishes an *in personam* cybersquatting claim for an "owner of a mark," and it has been applied to protect federally-registered marks and unregistered marks. *See, e.g., Lahoti v. Vericheck, Inc.,* 586 F.3d 1190, 1194, 1196-97 (9th Cir. 2009) (owner of unregistered trademark brought *in personam* ACPA claim); *Bosley,* 403 F.3d at 674, 680-81 (owner of registered trade mark brought *in personam* ACPA claim); *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201 (6th Cir. 2004) (owner of registered and unregistered marks brought *in*

*personam* ACPA claims); *City of Carlsbad,* 850 F. Supp. 2d at 1093, 1103 (owner of registered trademark brought *in personam* ACPA claim and the court noted that the ACPA protects both federally registered and unregistered marks).

The second subsection of the ACPA, § 1125(d)(2), provides that "the owner of a mark may file an in rem civil action against a domain name . . . if the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under [§ 11125(a) or 1125 (c)]." 15 U.S.C. § 1125(d)(2)A)(i). Thus, by its terms, the scope of an *in rem* action under the ACPA differs from the scope of an *in personam* action under the ACPA. Under § 1125(d)(1), "the owner of a mark" may bring an *in personam* claim for cybersquatting. However, under § 1125(d)(2), "the owner of a mark" may bring an *in rem* claim only if the defendant domain name (1) "violates any right of the owner of a mark registered in the Patent and Trademark Office," or (2) "protected under [§§ 1125(a) or (c )]." 15 U.S.C. § 1125(d)(2)(A)(i).

Based on its plain language, § 1125(d)(2)(A)(i) could be construed narrowly to limit the claims available for owners of unregistered marks, under the *in rem* provisions of the ACPA, to claims for infringement and dilution under § 1125(a) and (c). It could also be construed broadly to allow the "owner of a mark," registered or unregistered, to bring *in rem* claims against domain names that violate any provision of federal trademark law that protects registered marks from infringement, dilution, and cybersquatting, and that protects unregistered marks from infringement and dilution.[3]

As the court explained in *Harrods Ltd., v. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir. 2002), "[t]he broad language 'any right of the owner of a mark' . . . appears to include any right a trademark owner has with respect to the mark," and if "considered

---

[3] This distinction in the scope of an *in rem* claim under the ACPA is significant because the elements of infringement and dilution claims under §§ 1125(a) and (c) are similar, but not identical, to the elements of cybersquatting under § 1125(d)(1). For example, infringement and dilution claims require a showing that the infringing mark was used in connection with the sale of goods or services, or for a commercial use. *See Bosley,* 403 F.3d at 676-77. However, a cybersquatting claim does not require a showing of commercial use. *Id.* at 680. Furthermore, the scope of an ACPA *in rem* claim is significant in this case because Plaintiff did not allege infringement or dilution claims. (*See* Doc. 1.)

- 6 -

in isolation, it would authorize the in rem pursuit of any of the actions that could be brought in personam under U.S. trademark law, including infringement (subsection (a)), dilution (subsection (c)), and cybersquatting (subsection (d))." *Harrods,* 302 F.3d at 228-29 (citations omitted). The court further stated that "[o]f course, subsection (d)(2)(A) does not create a claim for the owner of *any* mark, but rather for the owner of 'a mark registered in the Patent and Trademark Office [PTO], or protected under subsection (a) or (c).'" *Id.* at 229. Thus, "[b]y its terms, subsection (d)(2)(A) does not provide an in rem action for the owner of *any* type of mark protected under trademark law, but only for the owner of a mark that is either (1) registered in the PTO or (2) protected under §§ 1125(a) or (c)." *Id.*

In *Harrods*, the court addressed the protections offered the owners of registered and unregistered marks. *Id.* The court found that the "protections offered a mark registered in the PTO" include the "additional benefit" that "registration now entitles the owner of the mark to proceed on an in rem basis under § 1125(d)(2)." *Id.* The court concluded that the owner of a registered trademark is not limited to *in rem* cybersquatting actions under § 1125(d)(1)(A), but can also bring *in rem* actions for other violations of the Lanham act, including infringement of a registered mark under § 1114, infringement claims under § 1125(a), and dilution claims under § 1125(c). *Id.* at 229-32.

Although the marks at issue in *Harrods* were registered, the court also noted that "even if a mark is not registered, the mark's owner may proceed on an in rem basis under § 1125(d)(2) if the mark 'is protected under subsection (a) or (c)," which are the infringement and dilution provisions of § 1125. *Id.* at 229. Therefore, the court concluded that § 1125(d)(2) provides *in rem* jurisdiction over a domain name that infringes a mark under § 1125(a) or dilutes a famous mark under § 1125(c). Both of these sections apply to unregistered marks. Therefore, it seems clear from the language of the statute, and the Fourth Circuit's analysis of the statute, that the owner of an unregistered mark may bring an *in rem* action against a domain name for infringement and dilution claims under §§ 1125 (a) and (c) of the Lanham Act.

The court, however, did not directly address whether the owner of an unregistered mark may bring an *in rem* action against a domain name for cybersquatting under § 1125(d)(1). However, in finding that the plaintiff, the owner of registered trademarks, was not limited under § 1125(d)(2) to *in rem* actions for cybersquatting under § 1125(d)(1), the court relied, in part, on the legislative history stating that the *in rem* provision of the ACPA "allows a mark owner to seek the forfeiture, cancellation, or transfer of an infringing domain name by filing an in rem action against the name itself, provided the domain name itself violates *substantive Federal trademark law*." *Id.* at 231 (citations omitted). The court concluded that "[o]n its face, subsection (d)(2)(A)(i) provides an in rem action for the violation of 'any right' of a trademark owner, not just rights provided by subsection (d)(1). Moreover, subsection (d)(2)(A)(i) authorizes in rem jurisdiction for marks 'protected under subsection (a) or (c), . . .'" *Id.* at 232.

While this analysis of the ACPA is informative, it does not resolve the issue presented here, whether the owner of an unregistered trademark may bring an *in rem* cybersquatting claim. The Court concludes that the *in rem* provision of the ACPA, and the Fourth Circuit's analysis of the statute in *Harrods*, could be understood to limit owners of unregistered marks to *in personam* cybersquatting claims under § 1125(d)(1), and *in rem* claims for infringement and dilution under §§ 1125(a) and (c). However, the ACPA, and the *Harrods* decision, could also be understood to allow owners of unregistered marks to bring *in personam* claims for cybersquatting under § 1125(d)(1), and *in rem* claims against domain names for cybersquatting, infringement, and dilution under §§ 1125(a), (c), and (d).

The latter, more expansive view of the statute would be consistent with the statements in cases that the ACPA applies to registered and unregistered marks. *See DaimlerChrysler,* 388 F.3d at 205 ("A trademark need not be registered to be entitled to protection under the ACPA."); *City of Carlsbad,* 850 F.Supp.2d at 1103 ("The ACPA protects both federally-registered marks as well as unregistered marks.") These cases,

however, did not address the scope of the *in rem* provisions of the ACPA for unregistered trademarks, but instead addressed *in personam* claims under the ACPA.

Furthermore, the Court's search for cases applying the ACPA did not clarify the scope of the statute's *in rem* provision because Court did not find a Ninth Circuit decision addressing this issue, and most of the cases address cybersquatting claims of registered trademark owners. *See, e.g., Denso Corp.,* 2014 WL 7208488, at *1 (owner of registered trademark brought *in rem* action under ACPA); *Rosa Mexicano Brands, Inc., v. Rosamexicanopuntademita.com,* 2014 WL 4181068, at *4 (E.D. Va. Aug. 20, 2014) (same); *Enterprise Holdings, Inc.,* 2012 WL 527355, at *2 (same); *Con-Way Inc., v. Conwayracing.com,* 2009 WL 2252128, at *1 (N.D. Cal. July 29, 2009) (same); *Cosair Memory, Inc., v. Cosair7.com,* 2008 WL 4820789, at *2, *4 (N.D. Cal. Nov. 4, 2008) (same).

The Court found three cases in which owners of unregistered marks asserted *in rem* cybersquatting claims against domain names. However, these cases do not address whether such claims are within the scope of the ACPA. *See Wagner v. Lindawagner.com,* 202 F.Supp.3d 574, 576, 579-80 (E.D. Va. 2016) (entering summary judgment against plaintiff, who claimed she owned an unregistered trademark, because she could not show that she owned a protected mark); *Twin Disc, Inc., v. Twindisc.cc,* 2014 WL 1401850, at *1-3 (E.D. Va. Apr. 8, 2014) (entering default judgment for plaintiff, who owned a federally-registered trademark and also had common law trademark rights in the mark, in an *in rem* cybersquatting claim under the ACPA); *Globalsantafe Corp. v. Globalsantafe.com,* 250 F. Supp. 2d 610, 612, 615 (E.D. Va. 2003) (finding that merged companies, who owned registered and unregistered marks, and had established *in rem* cybersquatting claim under the ACPA, could obtain a subsequent order for the domain name registry in the United States to cancel the defendant domain name, even when registrant obtained an injunction in a foreign court barring the foreign registrar from transferring the domain name).

Although these cases do not address the scope of the *in rem* provision of the ACPA, and thus do not resolve whether Plaintiff as the owner of an unregistered trademark may bring an *in rem* cybersquatting claim against the Defendant domain name, a noted commentator has concluded that such claims are within the scope of the ACPA. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25A:74 (4th ed. 2017). In the section addressing the ACPA, and the elements for *in rem* jurisdiction over a domain name, McCarthy states that a "trademark owner can assert via an in rem proceeding four possible violations of the Lanham Act:" (1) claims under "§ 1114(l) for infringement of a registered mark"; (2) claims under "§ 1125(a) for infringement of an unregistered mark"; (3) claims under "§ 1125(c) for dilution of a famous mark (registered or unregistered)"; and (4) claims under "§ 1125(d) for cyberpiracy of a mark (registered or unregistered)." *Id.*

After considering the language of the ACPA, the cases applying the statute, and other authority, the Court concludes that the scope of the *in rem* provision of the ACPA presents a close question of statutory construction. However, the Court has not found any cases or other authority concluding that the owner of an unregistered trademark cannot bring a cybersquatting claim against a domain name under the *in rem* provisions of the ACPA. To the contrary, the Court has found cases, while not directly on point, that appear to assume that such claims are permissible under the ACPA. *See Wagner,* 202 F. Supp. 3d at 576, 579-80; *Twin Disc, Inc.,* 2014 WL 1401850, at *1-3; *Globalsantafe Corp,* 250 F. Supp. 2d at 612, 615. Additionally, a noted commentator has concluded that such claims are within the scope of the ACPA. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25A:74 (4th ed. 2017). Finally, this interpretation of the statute is consistent with the goal of the ACPA to prevent misappropriation of trademarks through cybersquatting. *See Bosley,* 403 F.3d at 680 (citations omitted). Therefore, the Court concludes that Plaintiff, as the owner of an unregistered trademark, may bring a cybersquatting claim against the Defendant domain name under the *in rem* provisions of the ACPA.

### b. Elements of Cybersquatting Claim

A trademark owner asserting a claim under the ACPA must establish that (1) it has a valid trademark entitled to protection, (2) its mark is distinctive or famous, (3) the defendant domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark, and (4) the defendant used, registered, or trafficked in the domain name, (5) with a bad faith intent to profit. *Bosley,* 403 F.3d at 681. As set forth below, the Court finds that Plaintiff has sufficiently pled the elements of a cybersquatting claim.

First, Plaintiff must allege that it has a valid mark. Plaintiff alleges that it is the owner of an unregistered trademark, FRIEDKIN, which it has used "[f]or years" following its establishment as The Friedkin Group by Dan Friedkin in 2010. (Doc. 1 at ¶¶ 11, 12.) The Friedkin Group provides consulting and executive management services. (Doc. 1 at ¶ 11.) Plaintiff alleges that its use of the mark has been "longstanding, continuous, and exclusive" and that "consumers have come to associate the FRIEDKIN mark with the services provided by The Friedkin Group." (*Id.* at ¶ 12.) Thus, Plaintiff sufficiently alleges that it owns the unregistered mark FRIEDKIN and has common law trademark rights to the mark.

Second, Plaintiff must allege that its mark is distinctive or famous. Plaintiff alleges that the FRIEDKIN mark is distinctive. (*Id.* at ¶¶ 1, 18.) Plaintiff must prove that its mark is inherently distinctive or that it has acquired distinctiveness through a secondary meaning. *Lahoti,* 586 F.3d at 1197 (citations omitted). As the court explained in *Lahoti*, marks that are "suggestive," "arbitrary," or "fanciful," are inherently distinctive. Marks that are "generic," or that are "descriptive" and lack secondary meaning, are not distinctive and do not receive trademark protection. *Id.* The "primary criterion" for distinguishing between a suggestive and a descriptive mark "is the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to the particular product." *Id.* at 1198 (citations omitted).

A mark is suggestive "if 'imagination' or a 'mental leap' is required in order to reach a conclusion as to the nature of the product being referenced." *Id*. (citations omitted).

In this case, Plaintiff alleges that the FRIEDKIN mark is used in connection with Plaintiff's business of providing consulting and executive management services. In this context, the mark is not descriptive or generic. Rather, a mental leap is required to reach a conclusion as to the nature of the product offered. *See id.* at 1200 ("Context is critical to a distinctiveness analysis. Whether a mark is suggestive or descriptive 'can be determined only by reference to the goods or services that it identifies.'") (citations omitted), Thus, Plaintiff has sufficiently alleged that its mark is distinctive.

Third, Plaintiff must allege that the Defendant domain name is identical or confusingly similar to its distinctive mark. Plaintiff alleges that the Defendant domain name, *danfriedkin.com,* is confusingly similar to the FRIEDKIN mark. (*Id.* at ¶¶ 1, 18-20.) The Defendant domain name incorporates Plaintiff's mark, and adds the first name "Dan." Dan Friedkin established the Friedkin Group. (Doc. 1 at ¶ 11.)

"Courts generally have held that a domain name that incorporates a trademark is 'confusingly similar to' that mark if 'consumers might think that [the domain name] is used, approved or permitted' by the mark holder." *DaimlerChrysler,* 388 F.3d at 205 (domain name *foradodge* confusingly similar to DODGE mark) (citation omitted); *see also Enterprise Holdings, Inc.,* 2012 WL 527355, at *1, *5 (domain name *enterprisecarrentals.com* confusingly similar to ENTERPRISE mark); *Con-Way, Inc.,* 2009 WL 2252128 at *3 (domain name *conwayracing.com* confusingly similar to CON-WAY mark). Furthermore, "courts have consistently 'found that slight differences between domain names and registered marks, such as the addition of minor or generic words to the disputed domain names are irrelevant.'" *DaimlerChrysler,* 388 F.3d at 206. Therefore, the Court finds that Plaintiff has sufficiently alleged that the Defendant domain name is confusingly similar to its mark.

Fourth, Plaintiff must allege that Defendant used, registered, or trafficked in the domain name. Plaintiff alleges that Kumar registered the Defendant domain name

*danfriedkin*.com with GoDaddy on October 30, 2016, but was not authorized to use that domain name and had no affiliation with Plaintiff. (*Id.* at ¶¶ 13, 15.) These allegations are sufficient to establish that Kumar violated the statute by registering the domain name.

Finally, Plaintiff must allege that Defendant acted with a bad faith intent to profit. Plaintiff alleges that Kumar registered, trafficked in, and used the Defendant domain name in bad faith. (Doc. 1 at at ¶¶ 1, 21.) The ACPA lists nine nonexclusive factors for courts to consider in determining whether bad faith exists. 15 U.S.C. § 1125(d)(1)(B). The Court "need not, however, march through the nine factors seriatim because the ACPA itself notes that the use of the listed criteria is permissive." *Lahoti,* 586 F.3d at 1202 (citations omitted). Instead, in determining bad faith the court considers the unique circumstances of the case. *Id.* "Evidence of bad faith may arise well after registration of the domain name." *Id.*

Here, Plaintiff alleges that Kumar had no legitimate business purpose for registering the *danfriedkin.com* domain name, and registered the domain name as an act of cyberpiracy with the goal of later reselling that name to Friedkin for an exorbitant and unreasonable price. (*Id.* at ¶¶ 16, 21.) Plaintiff alleges that it sent a cease and desist letter to Kumar after learning that that Kumar had registered the allegedly infringing domain name, and Kumar responded with an offer to sell the Domain name to Plaintiff for $49,999. (*Id.* at ¶ 16.) In its recent notice, Plaintiff also asserts that it sent Kumar a copy of its request for entry of default, Kumar acknowledged receiving the motion and, after Plaintiff moved for default judgment, modified the domain name to include a solicitation to sell it for $19,000. (Doc. 14 at 1.) A defendant's willingness to sell a domain name for an exorbitant profit is a "quintessential" cybersquatting practice. *Lahoti,* 586 F.3d at 1203 (defendant offered to sell domain name to plaintiff for $72,500); *see also Bosley*, 403 F.3d at 674 (noting that bad faith under the ACPA includes making extortionate offers to sell the domain name) These allegations are sufficient to establish that Kumar acted in bad faith in registering the domain name.

In addition, with its motion for default judgment, Plaintiff submitted a sworn declaration with a depiction of the *danfiriedkin*.com website as of the date of the motion, showing that there was no content on the website, other than a Go Daddy "placeholder" indicating it was "parked."[4] (Doc. 13, Ex. A at ¶ 12.) Plaintiff asserts that the Kumar is not engaging in any bona fide attempt to offer goods or services using the Defendant domain name. (*Id*. at 5.) In its motion for default judgment, Plaintiff argues that Kumar, the registrant, provided false and incomplete contact information when registering the domain name because this information does not include his physical address and facsimile number. (Doc. 13 at 5.) Thus, Plaintiff argues that Kumar acted in bad faith in registering the Defendant domain name, because this conduct matches the two of the factors of bad faith enumerated in the ACPA. (Doc. 13 at 4-5.); *see also* 15 U.S.C. § 1125(d)(1)(B)(i)(VI) and (VII); *Lahoti,* 586 F.3d at 1202 (finding bad faith and noting that defendant never used domain name in connection with a bona fide offering of goods and services). The Court agrees and finds that Plaintiff has sufficiently pled that Kumar acted in bad faith.

Therefore, after applying the elements of a cybersquatting claim to Plaintiff's allegations, the Court finds that Plaintiff has sufficiently alleged a substantive claim for cybersquatting under 15 U.S.C. § 1125(d).

### c.    Remedies

Under the *in rem* provision of the ACPA, the remedies for cybersquatting are "limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain name to the owners of the mark." 15 U.S.C. § 1125(d)(2)(D)(I); Under Rule 54 (c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c). In its Complaint,

---

[4] In its filings with the Court, Plaintiff refers to the Defendant domain name alternatively as the domain name, web page, and website, and does not define these terms. (*See* Doc. 13, Ex. 1 at ¶ 2; Doc. 14 at 2.) As noted in a previous order, the Court defines a domain name, in general terms, as a unique name that identifies a website. (Doc. 15 at 1, n.1); *see also Harrods*, 302 F.3d at 221 (defining a domain name as an address at which a computer user accesses a website on the internet).

Plaintiff requests that the domain name *danfriedkin.com* be transferred to The Friedkin Group, or alternatively cancelled or forfeited. (Doc. 1 at Prayer for Relief, ¶ A.) Therefore, Plaintiff requests a remedy that is authorized under the ACPA for an *in rem* action, and that does not exceed the relief demanded in the Complaint.

## 2. The Inadequacy of Personal Jurisdiction

Under the second requirement for *in rem* jurisdiction under the ACPA, Plaintiff must show that it was unable to obtain personal jurisdiction over a person who would otherwise have been a defendant in a civil action under the ACPA, or that through due diligence it could not find the person who would have been a defendant in such an action. 15 U.S.C. § 1125(d)(2)(A)(ii). Here, Plaintiff has alleges that it cannot obtain personal jurisdiction over Kumar, the person who would be the defendant in a civil action under the ACPA, because he resides in India. (Doc. 1 at ¶¶ 6, 14, 22.) Plaintiff also asserts that Kumar has not used the domain name for any purpose other than to solicit bids for the purchase of the domain name. (*Id*. at ¶ 16; Doc. 13 at 5; Doc. 14 at 1.)

Based on Plaintiff's allegations, it appears that Kumar's only known contact with Arizona was registering and maintaining the Defendant domain name with GoDaddy. This limited contact is insufficient to establish personal jurisdiction over Kumar. *See Denso Corp.*, 2014 WL 7208488, at *3 (registering and maintaining a domain name in the forum is not sufficient to establish personal jurisdiction). In *Denso*, the court explained that the ACPA creates an *in rem* cause of action in the district where a domain name is registered and, consequently, in most or all potential ACPA *in rem* suits an alleged cybersquatter will have the specific contact of having registered the defendant domain name with an entity in the forum. *Id.* at *4. If such contact were sufficient to establish personal jurisdiction over the registrant of the domain name, that would "almost always" defeat *in rem* jurisdiction under the ACPA, and "in this crucial respect the ACPA would be made pointless." *Id*.

Because Kumar, the registrant of the Defendant domain name, resides in India and does not appear to have any ongoing business activities in the United States, Plaintiff has

established that it is unable to obtain personal jurisdiction over Kumar and, therefore, that it may proceed in an *in rem* action against the Defendant domain name. *See Enterprise Holdings,* 2012 WL 527355, at *3 (plaintiff could not establish personal jurisdiction over the registrant of the domain name who resided in India and did not have other business contacts with the United States); *see also Con-Way Inc.,* 2009 WL 2252128, at *2 (plaintiff could not establish personal jurisdiction over registrant of domain name by asserting that domain name was registered in the forum, or by showing that the domain name was a passive website that provided links to other sites but did not sell products within the forum); *Globalsantafe Corp.,* 250 F. Supp. 2d at 615 (same).

### C. Service of Process

"Plaintiff must also establish that service of process was proper." *Con-Way, Inc.*, 2009 WL 2252128 at *3 (granting motion for default judgment and addressing jurisdiction and service of process in ACPA *in rem* action). "The ACPA provides a federal statutory alternative to the normal service requirements of [Rule] 4(f)." *Guo v. 8bo.com,* 2014 WL 2581315, *2 (N.D. Cal. June 6, 2014) (citing 15 U.S.C. § 1125(d)(2)(A)-(B)). Therefore, the Court analyzes service under the statute, not Rule 4(f). *Id.* (citations omitted).

Under the ACPA, § 1125(d)(2)(A)(ii)(II), service of process in an *in rem* action is made by "sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar," and "publishing notice of this action as the court may direct promptly after filing the action." 15 U.S.C. § 1125(d)(2)(A)(ii)(II)(aa) and (bb); *see also* § 1125(d)(2)(B) ("The actions under subparagraph (A)(ii) shall constitute service of process.")

In this case, Plaintiff served the Defendant domain name by sending a file-stamped copy of the Complaint, by mail and e-mail, to the domain name registrant (Doc. 6 at Ex. 1, ¶¶ 2, 4; Doc. 11, Ex. 1 at ¶ 4; Doc. 13 at 2), and by publishing notice of this action, as directed by the Court. (Docs. 6, 7, and 8; Doc. 11, Ex. 1 at ¶¶ 6-7.)

Therefore, the Court finds that Plaintiff has complied with the notice provisions of § 1125(d)(2)(A)(ii)(II)(aa)-(bb) and has properly served Defendant.

### III. Default Judgment

Under Rule 55(a), the Clerk of Court shall enter default "[w]hen a party against who a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Rule 55(b) provides that the Court may grant a default judgment after default has been entered by the Clerk of Court. *Id.* at 55(b). "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *TeleVideo Sys., Inc., v. Heidenthal,* 826 F.2d 915, 917-18 (9th Cir. 1987) (citations omitted).

The Ninth Circuit has established seven factors for courts to consider in determining whether to grant default judgment. *See Eitel v. McCool,* 782 F.2d 1470, 1471-72 (9th Cir. 1986). These factors, known as the *Eitel* factors, are (1) the possibility of prejudice to the plaintiff, (2) the merits of the plaintiff's substantive claim. (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of dispute concerning material facts (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Id.*

In this case, the first, second, third, and sixth factors favor granting default judgment. Applying the first factor, the possibility of prejudice to Plaintiff is high if the Court does not enter default judgment because Plaintiff may be without any recourse for recovery. As set forth above in Section II.B.1, the Court has addressed the merits of Plaintiff's substantive claim and the sufficiency of the Complaint, the second and third factors, and found that Plaintiff has sufficiently alleged a substantive claim for cybersquatting under 15 U.S.C. § 1125(d)(1)(a).

Under the sixth factor the possibility of excusable neglect is low. Plaintiff sent an e-mail to Kumar, the domain name registrant, notifying him that the Defendant domain name violated the APCA and its intent to bring this action. (Doc. 1 at ¶ 15, Ex. B.)

Plaintiff also sent an e-mail to the registrant with a copy of the Complaint, and another e-mail with a copy of the motion for entry of default. (Doc. 11, Ex. 1 at ¶ 4; Doc. 13, Ex, 1 at ¶ 10.)  Kumar responded to the cease and desist letter by offering to sell the Defendant domain name to Plaintiff for $49,999. (Doc. 1 at ¶ 16, Ex. C.)  Kumar responded to the e-mail sending the motion for entry of default with an e-mail stating "Thank you for the update." (Doc. 14 at 2.)  Therefore, it is very likely that Kumar received notice of this action and his failure to respond was not the result of excusable neglect.

The fourth factor is inapplicable as there is no sum of money at stake in the action. The fifth and seventh factors, as always, favor denying default judgment. Although there is a strong policy favoring a decision on the merits, and the possibility that Defendant would dispute the material facts, the existence of Rule 55 and the possibility of default judgment means that these factors are not dispositive. *See Phillip Morris USA, Inc. v. Castworld Prods.,* 219 F.R.D. 494, 501 (C.D. Cal. 2003) (citations omitted). Defendant's failure to answer the Complaint makes a decision on the merits impractical, if not impossible. *Id.* Therefore, after considering the *Eitel* factors, the Court concludes that default judgment should be entered against the Defendant domain name.

**IV. Conclusion**

As set forth above, Plaintiff has sufficiently alleged an *in rem* cybersquatting claim under the ACPA, it properly served the Complaint, to which Defendant failed to respond, and the Clerk of Court properly entered default. In addition, on a motion for default judgment the Court accepts Plaintiff's well pleaded facts as true, and the *Eitel* factors favor granting default judgment.

Accordingly, the Court recommends that the motion for default judgment (Doc. 13) be granted and that the Court enter an order directing the domain name registrar, GoDaddy, to transfer the domain name *danfriedkin.com* to Plaintiff.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's

judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6, 72. The parties have fourteen days within which to file a response to the objections. Failure to file timely objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).

Dated this 14th day of August, 2017.

Bridget S. Bade
United States Magistrate Judge